LUCAS KELLS v. M. M. WILLIAMS and Others.[1]

July 12, 1897.

Nos. 10,559—(172).

**Delivery of Guaranty—Estoppel—Weight of Evidence.**
Evidence considered and *held* sufficient to justify the verdict of the jury.

Appeal by plaintiff, as assignee of Nehemiah P. Clarke, insolvent, from an order of the district court for Morrison county, Baxter, J., denying his motion for a new trial after a verdict for defendants. Affirmed.

*Geo. W. Stewart,* for appellant.

*Taylor, Calhoun & Rhodes* and *Lindbergh, Blanchard & Lindbergh,* for respondents.

BUCK, J.

Under the title of Clarke v. Williams this case was here before on appeal, and is reported in 61 Minn. 12, 62 N. W. 1125. The plaintiff is now the assignee of Clarke, but the subject-matter is the same, and the evidence substantially as given upon the former trial.

The suit was brought by Clarke against Williams and others to recover a balance due on a written instrument signed by the defend-

1 Reported in 72 N. W. 112.

ants, by the terms of which, in consideration that one William Sauntry would build a sawmill at Little Falls, and perform certain other things, and in consideration of the mutual covenants and agreements of the signers to and with each other, the signers jointly and severally promised to pay to the order of Sauntry $15,000 on the completion of said mill before a certain day. The complaint alleges performance by Sauntry, and an assignment of the obligation to Clarke.

It appears that a certain syndicate intended to locate a sawmill plant at Little Falls, and to carry out this scheme involved the purchase of a large amount of property; among other things, a sawmill and other real property owned or controlled by Clarke, valued by him at $40,000. The syndicate would only pay $25,000, and the remainder was to be raised by the people of Little Falls. This $15,000 was to be raised by subscriptions ostensibly for the syndicate, but really for Clarke's benefit. To this end two subscription papers were circulated, marked Exhibits H and I in the record, having, however, only one object in view, viz. the raising of $15,000, and running to the syndicate, payable only when the mill was permanently located at Little Falls, with a certain capacity, but only $11,700 was subscribed.

Then Clarke, having examined the papers, raised the point that only $11,700 had been subscribed, and that some of these subscribers were not financially responsible, and that it would be necessary to have some guaranty of parties who were responsible, and thereupon another paper—Exhibit K—was drawn up, and signed by many persons who had signed Exhibits H and I. This was done for the purpose of increasing the amount subscribed pro rata to $15,000. To meet the other objection raised by Clarke, that some of the subscribers were not financially responsible, Exhibit J was circulated, and signed by 26 individuals and firms, the signers guarantying the payment by all of the foregoing subscribers.

Subsequently, and on the 15th or 16th day of February, 1891, Sauntry, with his attorney, Clarke, with his attorney, and Messrs. Rothwell, Davidson, Morrill, and Williams, met in St. Paul for the purpose of finally disposing of the matter, and, after discussing the financial standing of the signers to the various papers, Clarke's at-

torney refused to accept the papers, but produced Exhibit A,—the one upon which suit is now brought. This is a joint and several guaranty bond agreeing to pay $15,000 to William Sauntry or order when said sawmill should be complete and ready for operation on or before April 1, 1892. This was then signed by Williams, Rothwell, Morrill, and Davidson upon the express agreement and understanding of all parties that it should not be delivered until it was signed by all the signers of Exhibit J, with the exception of one or two persons. Only ten persons and firms signed this guaranty bond besides the four persons above named, thus making only fourteen signers upon the new bond, while there were fourteen parties who signed the original guaranty bond who did not sign the new one. On trial before a jury it returned a verdict as follows, in answer to the question submitted to them:

"Was the agreement Exhibit A, in evidence in this action, delivered to William Sauntry or N. P. Clarke, or any one for them or either of them? Answer. No."

It also returned a general verdict for all the defendants. Plaintiff moved for a new trial, which was denied, and he brings this appeal.

The evidence is well-nigh, if not entirely, conclusive: (1) That there was an agreement among those who signed Exhibit A at St. Paul that it should not be delivered or become operative until certain other parties should also sign it, some of whom never did sign it. (2) That Sauntry, the original obligee, as well as Clarke, his assignee, knew of this agreement, and that this instrument got into the possession of Clarke without the authority or consent of the defendants.

It is contended that defendant Davidson, by his conduct, should be estopped from denying his liability upon the instrument Exhibit A, and that, if there was any irregularity about it, he had, by such conduct, ratified and confirmed it as a valid obligation as against himself. But the evidence is quite conclusive, that by his agreement at the meeting in St. Paul, he was not to be bound by its terms unless all of the other parties whose names were on Exhibit J should first sign it, which they did not. He never delivered it to Clarke, or any one else, for collection.

The point is made that Exhibit A was sent to the bank of which Davidson was an officer, and that he made collections thereon, and remitted the same to Clarke, and thus ratified its execution. But the uncontradicted evidence is that not a dollar was ever collected upon this guaranty bond, but upon the subscription papers. Davidson never regarded Exhibit A as a valid obligation, and never supposed Clarke so regarded it, or that he would sue upon it, but would sue, if at all, upon Exhibit J. Not only did Clarke know that Davidson would not consent to have the instrument delivered and be considered a completed one until signed by others, but, taking part in the meeting at St. Paul, he said emphatically that every honest man who signed the original guaranty would sign Exhibit A, and then said that he would leave the matter entirely with the four men who had already signed it.

What was he to leave entirely with them? It was the matter of obtaining more guarantors,—all, at least, of the others who were on the Exhibit J. If this matter was left to them by Clarke, then they had the right to tell each subsequent guarantor the conditions upon which the guaranty was to be signed, and they had a right to rely upon such representations, and Clarke was bound thereby, and we do not think it was error to permit such other guarantors to testify as to the conditions upon which they signed the bond. If they were informed by the first signers that the guaranty was not to be delivered until signed by all whose names were on the first bond, they had a right to rely upon such representations without communicating it to Sauntry or Clarke, and they well knew in the first instance that the instrument was not to become valid and operative unless signed by all who had signed Exhibit A. Hence it was not necessary for the defendants, who appeared by Messrs. Taylor, Calhoun & Rhodes as their attorneys, to allege in their answer that any such agreement was communicated to Sauntry or Clarke.

That they did not sign is an admitted fact. That they were to sign is a proven fact. When Sauntry and Clarke first saw Exhibit A, they knew that the condition to which they had assented, and upon which it was to become a completed instrument, had not been complied with. It was immaterial that they were satisfied with the responsibility of the parties who had already signed. They were

69 M.—18

not innocent acceptors of a perfect and completed bond, but in some unexplained manner they got hold of an undelivered and uncompleted instrument, and it was not necessary for the signers to notify them of its conditional execution and delivery.

The order denying the motion for a new trial is affirmed.

CANTY, J. (dissenting).

There are portions of the foregoing opinion in which I cannot concur. In my opinion, the evidence is not "well-nigh conclusive" that there was an agreement that Exhibit A should not be delivered or become operative until certain other parties should also sign it, some of whom never did sign it. But the evidence will sustain a finding to that effect, and that is all that it is necessary here to consider on that point.

The important point, however, on which I differ with the majority is as to the liability of the defendant Davidson. In my opinion, it conclusively appears that he subsequently waived the condition, if any existed, that Exhibit A should not be delivered or become operative until certain other persons had signed it. After Clarke received the instrument, he sent it for collection to a bank of which Davidson was cashier. The instrument remained in the bank for collection for about a year. During this time Davidson wrote Clarke three letters, one of which, dated May 11, 1892, reads as follows:

"We enclose herewith our St. Paul check for $4,000.00 in part payment of the $15,000 bonus given to the Pine Tree Lumber Co. The committee promise to get at work at once, and collect in the balance due on this subscription.
                              "Yours truly,
                                        "A. R. Davidson, Cr."

Another, dated June 8, 1892, reads as follows:

"Gentlemen: Herewith please find our check for $1,787.00 to apply on the Weyerhauser bonus. We have taken notes for about $3,000.00, and the balance we expect to collect in next week. We will close up this balance soon.
                              "Yours very truly,
                                        "A. R. Davidson, Cr."

Another, dated October 27, 1892, reads as follows:

"Enclosed herewith please find our check on St. Paul for $1,240.00

to apply on the Weyerhauser syndicate bonus. Please acknowledge, and oblige,

"Yours truly,

"A. R. Davidson."

Davidson also made in his own handwriting the following indorsements on the back of Exhibit A while it was in the bank:

"Paid $4,000.00, May 11, 1892.
"Paid $1,787.00, June 9, 1892.
"Paid $2,150.00, Sept. 12, 1892.
"Paid $1,240, Oct. 27, 1892."

When called as a witness on the trial, he admitted all of these things, but tried to explain away the effect of them by stating that the amounts so collected and remitted to Clarke were, in fact, collected on the subscription lists and the other written guaranty mentioned in the majority opinion, all of which Clarke refused to accept. But Davidson admits that he never informed Clarke that he collected the amounts on these other instruments. He never informed Clarke that he claimed that Exhibit A was not a valid obligation, until he put in his answer in this action. As to these matters, Davidson testified on cross-examination as follows:

"Q. Why didn't you write to Mr. Clarke disclaiming any liability on it? A. Simply because we were making collections on these other subscriptions. Q. You expected to get $15,000, and didn't expect to pay anything on Exhibit A? A. I never expected to pay anything on Exhibit A. Q. You expected to get the full $15,000 on these other papers? A. Yes, sir. Q. And it was not until after you failed to get the $15,000 on these other papers you objected to the delivery of Exhibit A? A. As a matter of fact, I never objected to the delivery of Exhibit A until after this suit was commenced."

I am of the opinion that it conclusively appears that Davidson waived the condition, and that, as to him, a new trial should be granted.